**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **CITIZENS CORPORATION,** | ) | **CASE NO. 311-11792** |
| | ) | **CHAPTER 11** |
| **Debtor,** | ) | |
| | ) | **JUDGE MARIAN F. HARRISON** |
| | ) | |
| **CITIZENS CORPORATION,** | ) | **ADV. NO. 311-0628A** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TENNESSEE COMMERCE BANK,** | ) | |
| **AND LEGENDS BANK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## MEMORANDUM OPINION

_____

This matter is before the Court in the above-styled bankruptcy case on the debtor's

Expedited Motion for Contempt and Sanctions for Violation of the Automatic Stay and

Legends Bank's (hereinafter "Legends")[1] Motion for Appointment of Chapter 11 Trustee,

---

[1]Legends asserts that it is the lead lender with respect to certain secured indebtedness owed to Tennessee Commerce Bank (hereinafter "TCB") and participated in by TCB, Citizens Bank, CedarStone Bank, Community First Bank & Trust, and Legends (hereinafter "Lender Group"). TCB was closed by the Tennessee Department of Financial Institutions on January 27, 2012, and the Federal Deposit Insurance Corporation (hereinafter "FDIC") was named Receiver.

and in the above-styled adversary proceeding on the debtor's Expedited Motion for Preliminary Injunction. For the following reasons, which represent the Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. P. 7052, and made applicable by Fed. R. Bankr. P. 9014(c), the Court finds that a Chapter 11 Trustee should be appointed and that the debtor's motions should be reserved until such time as a Chapter 11 Trustee has been appointed.

## I. <u>FINDINGS OF FACT</u>

The debtor was chartered in 1985 by Marion Ed Lowery (hereinafter "Mr. Lowery") as a one-bank holding company in Smithville, Tennessee. The purpose was to purchase Citizens Bank of Smithville. The debtor later acquired the Bank of Ardmore in Ardmore, Tennessee, and the Bank of Giles County in Pulaski, Tennessee. In the fall of 1993, the debtor sold all of its holdings and signed a long-term agreement with the First City Bank of Murfreesboro to furnish data processing services. Financial Data Technology Corporation (hereinafter "FiData") was formed that same year as a wholly owned subsidiary of the debtor to provide those services. Specifically, FiData offers the Fiserv Premier suite of products to its banking customers, which include core account processing, item processing, internet banking, and other products. FiData also serves as an internet service provider for its clients. The debtor holds 100% of FiData's shares. The debtor is owned by its parent company, Infinite Capital Strategies, Inc., f/k/a Williamson Holdings, Inc. (hereinafter "ICS"), which is a holding company without employees. Mr. Lowery is the president, CEO, and majority

shareholder of ICS.  In 1999, Jean Ramsey (hereinafter "Ms. Ramsey") was asked by Mr. Lowery to come work for FiData.  Since that time, Ms. Ramsey has served as a director and president of FiData.  Currently, Ms. Ramsey is the only director of FiData.

On March 20, 2007, TCB loaned the debtor $11,000,000, for which the debtor pledged its FiData stock as collateral.  This loan was personally guaranteed by Mr. Lowery and his wife, Cynthia C. Lowery (hereinafter "Mrs. Lowery").  According to Mr. Lowery, the debtor then loaned this money to him for the purchase of stock in Peoples State Bank and Farmers Bank.  The stock was purchased by Mr. Lowery so that the debtor could avoid becoming a bank holding company.  As of the petition date, the debtor owes no principal, $485,993.45 in accrued interest, and $93,726.32 in late charges.

On March 24, 2008, TCB made a second loan to the debtor in the maximum principal amount of $22,500,000.  As collateral for the loan, the debtor again pledged all of its stock in FiData.  As part of the agreement, TCB took possession of the stock certificates representing the debtor's shares in FiData for the purpose of perfecting and establishing first priority of its security interest in those shares.  Mr. and Mrs. Lowery again provided 100% individual guaranties.

Originally, Mr. Lowery planned for the dividends for Peoples State Bank and Farmers Bank and FiData's revenue to service the debt of all the related entities.  After the market

crash in 2008, there were no more bank dividends, and FiData began servicing all the debt, causing cash flow problems. FiData recorded net income of over $1,000,000 in 2009 and over $1,300,000 in 2010. Andrea Martin (hereinafter "Ms. Martin"), the accounting manager for FiData and other related entities, testified that the demands placed on FiData caused it to be severely strapped for cash. The intercompany receivables owed by the debtor to FiData increased from $1,851,479 as of December 31, 2009, to $5,303,795 as of December 31, 2010, and to $6,732,229 as of December 31, 2011.[2]

During this time, Mr. Lowery frequently asked Ms. Martin for funds from FiData. She would explain that FiData needed these funds to pay bills, but Mr. Lowery insisted that he had things to pay. These requests became more and more frequent beginning in June 2011. In addition, Mr. Lowery would transfer funds online late at night or early in the morning. These transfers were made from the FiData account to the debtor's account and then transferred to Mr. Lowery's personal account. This was all done during a time when FiData was having problems paying its bills, and FiData was constantly receiving cutoff notices from critical venders, some of whom imposed late charges. The record reflects multiple transfers from FiData to the debtor, as well as to Mr. Lowery and other stockholders. Mr. Lowery testified that the withdrawals by him were not used for personal

---

[2]These numbers come from Legends' Exhibit 27. Based on Legends' Exhibit 28, Ms. Martin testified that as of November 15, 2011, the debtor owed FiData $7,319,166.13. The difference between the amount owed as of November 15, 2011, and the amount owed as of December 31, 2011, was never explained.

use.  Instead, the withdrawals were used to purchase TCB stock, shares of related entities, or as a cash infusion into Farmers Bank.  However, given the ultimate transfers to the debtor's accounts, together with Ms. Martin's questions regarding the late-night transfers to Mr. Lowery's personal account, Mr. Lowery's explanations were less than credible and did nothing to eliminate concern about the bleeding of FiData and the debtor.

The debtor made significant loans to insiders.  Many of these were participation loans.  For example, the debtor borrowed money from two banks and loaned the money to Bruce T. Weathers (hereinafter "Mr. Weathers"), an employee and director.  Mr. Weathers used this loan to purchase $2,668,931.37 in ICS stock,[3] the debtor's parent company.  The total owed by Mr. Weathers to the debtor is $5,875,000 and this amount includes prior loans from the debtor to Mr. Weathers.  The debtor agreed to pay interest on these personal loans for two years and increased Mr. Weathers' salary so that he could make payments, however, he made no payments except for dividend payments received on the ICS stock.  Using the funds received from Mr. Weathers' purchase of stock, ICS purchased $2,668,931.37 in the debtor's stock.  Similarly, ICS borrowed $1,850,000 from the debtor to purchase stock in the debtor.  In yet another transaction, the debtor loaned $7,892,500 to ICS.  In turn, ICS loaned $7,867,500 to Mr. Lowery in return for 100% of his stock in Equipment Service

---

[3]To avoid confusion, when the Court refers to ICS, it may have been Williamson Holdings, Inc., at the time of the transaction.

5 - U.S. Bankruptcy Court, M.D. Tenn.

Corporation,[4] who then used $6,954,000 to repay loans he owed the debtor.  Needless to say, there were numerous circular transactions between the debtor, and its related entities, Mr. Lowery, and other various insiders.

On January 20, 2010, ESC and FiData entered into a Master Equipment Lease.  The lease provided that FiData would sell all of its equipment and software to ESC for $489,956.47 and then lease the equipment and software back from ESC for $5117.93 per month.[5]  That same date, Mr. Lowery transferred $885,000 from FiData to the debtor's account.  Mr. Lowery testified that under the debtor's proposed plan, FiData will continue to make lease payments to ESC.[6]

On June 2, 2010, the debtor paid Mrs. Lowery $1,700,000 to purchase a house in Georgia.  Mr. Lowery testified the house was intended as an investment property which would also be used for entertaining clients, although Ms. Martin testified Mr. Lowery never presented receipts for entertaining clients there.  For a period of time, the debtor paid all

---

[4]Equipment Service Corporation (hereinafter "ESC") is a sister company to the debtor and is also wholly owned by ICS.  ESC is now known as Southern Hospitality Investments, Inc.

[5]ESC has a software lease agreement with FiServe Solutions, Inc. (hereinafter "FiServe") and subleases the software licenses to FiData.  In the debtor's Disclosure Statement, it states "[b]ecause FiData does not own the licenses for the Fi-Serve suite of products, FiData's value in a liquidation scenario would likely be limited to the liquidation value of its fixed assets."  There may be an issue as to whether FiServe allows for the subleasing of its software licenses but as it stands, Mr. Lowery and ICS control the ability of FiData to remain in operation.

[6]See debtor's Disclosure Statement, Exhibits C-1, C-3, C-5, C-7, and C-9.

6 - U.S. Bankruptcy Court, M.D. Tenn.

expenses on the property, including the cost of furnishing and decorating the house. When the parties realized that title on the property had never been transferred to the debtor, the real property was moved out of the debtor's fixed assets and two *unsecured* promissory notes were signed whereby Mrs. Lowery agreed to pay the debtor $1,700,000 (the house) and $118,361.90 (decorating). To date, no payments have been made on either of these promissory notes. Mr. Lowery testified that he later deeded the property over to Tennessee Bank & Trust to extinguish a debt owed by his family trust and guaranteed by Mr. and Mrs. Lowery.

The debtor provided Mr. Lowery with a MasterCard account for his personal expenses. The debtor paid the bill monthly through funds transferred from FiData, and then Mr. Lowery would reimburse the debtor at the end of the year. Ms. Martin testified that Mr. Lowery did not reimburse the debtor at the end of 2010, so the balance was transferred to miscellaneous receivables. None of these have been paid. Mr. Lowery never indicated that the account was used for business expenses and never provided any receipts. Mr. Lowery testified that he borrowed an average of $350,000 for personal expenses over the last three years.

Mr. Lowery further testified that miscellaneous receivables owed by him to the debtor were written off by the Debt Previously Contracted Agreement (hereinafter "DPC Agreement"). Under the DPC Agreement, Mr. Lowery transferred ownership of his stock

in Peoples State Bank and Farmers Bank to TCB in order to reduce the debt owed to TCB by the debtor. In turn, Mr. Lowery's debt owed to the debtor was reduced by $1,689,000,[7] despite the language of the guaranty agreements with TCB signed by Mr. and Mrs. Lowery. Specifically, the guaranty agreements provided that the "Guarantor irrevocably and absolutely waives any and all rights of subrogation, contribution, indemnification, reimbursement or any similar rights against the Debtor with respect to this Guaranty."

Many times, Ms. Martin was asked to deposit checks from the debtor into Mr. Lowery's personal accounts at various banks. Ms. Martin further testified that these deposits from the debtor to Mr. Lowery's personal accounts became more frequent starting in June 2011. As examples, Ms. Martin testified that in one day she deposited $80,000 into Mr. Lowery's personal account and that she deposited $10,000 almost monthly into Mr. Lowery's personal account – all from the debtor's account. None of these transactions were explained to Ms. Martin nor were they explained satisfactorily in court.

In March 2011, the debtor, through Mr. Lowery, obtained a line of credit for FiData in the amount of $975,000 from TCB. That same date, Mr. Lowery asked TCB to advance the entire amount to FiData's operating account. These funds were transferred to the debtor's account, and only $65,000 of the funds was returned to FiData so that it could pay

---

[7]Interestingly, the debtor has amended its Schedules to reflect amounts owed by Mr. Lowery before the DPC Agreement was entered into because this credit has been questioned.

8 - U.S. Bankruptcy Court, M.D. Tenn.

some bills. FiData has continued to pay the interest, and this line of credit has never been in default.

FiData's cash flow became more problematic, and Mr. Lowery began negotiations with TCB in 2011 about restructuring the debtor's debt. However, by letter dated August 1, 2011, TCB declared an Event of Default under the Pledge and Security Agreements. TCB accelerated the amounts due and demanded payment in full. TCB also utilized its remedies under Section 6(f)(i)[8] of the Pledge and Security Agreements to exercise the voting option and other consensual rights, and all rights to receive dividends, over the debtor's stock in FiData. Discussions between TCB and Mr. Lowery continued. As part of those discussions, Mr. Lowery signed a DPC transaction in September 2011 whereby stock in the two banks was transferred to TCB in exchange for reducing the debt to approximately $17,000,000. While Mr. Lowery believed he had reached an agreement to restructure the remaining debt, that was not the case. Thomas Bates (hereinafter "Mr. Bates"), the president and chief operating officer of Legends, testified that the Lender Group was more comfortable with

---

[8]Section 6(f)(i) of the 2007 and 2008 Pledge and Security Agreements provided that upon the occurrence of an "Event of Default and for so long as it continues:"

> all rights of Pledgor to exercise the voting, option and other consensual rights which it would otherwise be entitled to exercise and to receive dividends which it would otherwise be authorized to receive and retain . . . shall, at the Lender's option, cease, and all such rights shall thereupon become vested in Lender which shall have the sole right to exercise such voting, option and other consensual rights and to receive and retain such dividends (and Pledgor covenants and agrees thereupon, if requested by Lender, to deliver to Lender irrevocable proxies with respect to the Pledged Collateral in confirmation of Lender's rights hereunder).

making a loan to FiData rather than the debtor because it would be easier to identify cash flow with FiData. At Mr. Bates' request, Ms. Ramsey called a special FiData board meeting on August 5, 2011. Mr. Bates attended the meeting to discuss the possible loan, the Lender Group's concerns about FiData's payables and receivables, and the board's fiduciary duties. At the meeting, the directors adopted a resolution to contain the revenues produced by FiData for the sole benefit of FiData and to stop the intercompany transfers. The resolution was amended at a second meeting held on August 8, 2011. Mr. Lowery testified that until the board meeting on August 5, 2011, he believed that the Lender Group was interested in participating in a new loan to the debtor.

Ms. Ramsey testified that the resolution stopping intercompany transfers was necessary for FiData to pay bills. To stop the intercompany transfers, Ms. Ramsey set up a separate account into which all of FiData's receipts were deposited. In turn, these deposits were used to pay down the working line of credit. FiData then started making detailed cash budgets every week. TCB would approve the budgets and allow FiData to make disbursements from the line of credit. With this change, FiData began paying its past due bills. Ms. Ramsey testified that FiData's accounts payable have been reduced from $1,100,000 to $400,000 and that all trade debt is current. Ms. Ramsey also made the decision to accept the offer of Bank of Perry County to prepay FiData's service bill for the remainder of the year, and those funds allowed FiData to make additional payments on the line of credit.

On September 26, 2011, Ms. Ramsey called a shareholders meeting. Using the proxy of TCB's shares, Ms. Ramsey voted to remove the other two directors because she felt that they had conflicts of interest. TCB's proxy was limited to the vote on directors and the choice of an accounting firm.

Ms. Ramsey and Ms. Martin both testified that Mr. Lowery was very upset about FiData taking control of its cash flow and stopping intercompany transfers. Mr. Lowery told them that receipts should be used to pay off accounts payable rather than to pay off the line of credit. Mr. Lowery's hostility increased, and Ms. Ramsey made the decision to move herself, Ms. Martin, and Ms. Martin's assistant out of FiData headquarters to an office suite leased by Peoples Bank. FiData pays rent for the office suite, and only FiData employees have the code to get in the door. No one else, including members of the Lender Group, have access. Ms. Ramsey testified that FiData's business development staff is continuing to seek out new clients. While FiData is doing better with cash controls, Ms. Ramsey is concerned that FiData has no capital to provide a safety net for the company's future. Mr. Lowery conceded that he did not have capital to inject. Ms. Ramsey testified that a capital injection of $2,000,000 into FiData is necessary long term.

In November 2011, commercial participation loans totaling $39,946,717.94 were written off of the debtor's loan portfolio without explanation. Ms. Martin testified that she did not make the entries and had no way of identifying the particular participation loans that

11 - U.S. Bankruptcy Court, M.D. Tenn.

were written off. Another entry indicates that $1,678,457.70 was removed from the debtor's accounts receivable with the notation "to correct posting from wrong account." Ms. Martin testified that this posting is inaccurate. Instead of correcting a posting, this entry was a write off of miscellaneous accounts receivable owed by Mr. Lowery to the debtor. Mr. Lowery testified that there was an incorrect posting which was fixed, although his testimony was not as credible as Ms. Martin's testimony.

The debtor filed its voluntary petition on November 28, 2011. Mr. Lowery signed the petition as Chairman of the debtor. The debtor did not file its original schedules and statement of financial affairs until December 23, 2011. Several amendments to the schedules and statement of financial affairs have since been filed. For example, on the original statement of financial affairs, the debtor listed no distributions to insiders. Mr. Lowery testified that he did not understand the full meaning of "distributions" at the time the statement was filed or when the U.S. Trustee asked him about it at the Meeting of Creditors. It was only after his deposition and further discussions with his attorneys that he realized that distributions had been made. This error was corrected on an amended statement of financial affairs filed on January 26, 2012.

Mr. and Mrs. Lowery were also not listed on Schedule H as co-debtors on the debt to TCB. Mr. Lowery explained that he did not understand that guarantors were co-debtors. Schedule H was amended to correct this on January 6, 2012. Schedule B of the debtor's

12 - U.S. Bankruptcy Court, M.D. Tenn.

Schedules was amended three times, the last amendment being filed on January 26, 2012. The original Schedule B listed notes receivable from Mr. Lowery as $14,736,554.74. In the final amended Schedule B, filed on January 26, 2012, the notes receivable from Mr. Lowery are listed as $28,995,731.88.

The debtor filed its disclosure statement and proposed plan on January 19, 2012. Ms. Ramsey testified about her concerns with the proposed plan, which relies on revenues from FiData. First, short term revenues for FiData are likely to decrease because purchasers of the failed TCB and the two other banks owned by TCB will likely use their own data system rather than FiData. Second, the plan provides for the write off $6,732,229[9] in receivables owed by the debtor to FiData. Finally, Mr. Lowery admitted that neither he nor the debtor have the ability to infuse capital into FiData and that the debtor's proposed plan does not provide for any infusion of capital into FiData.

## II. ARGUMENTS

The Lender Group asserts that cause exists to appoint a Trustee because Mr. Lowery has withdrawn significant amounts of funds from FiData through the debtor's bank accounts and then used those funds to pay his personal obligations. In addition, the Lender Group contends that Mr. Lowery has acted in ways that have made it difficult for FiData to continue

---

[9]See Footnote 2.

13 - U.S. Bankruptcy Court, M.D. Tenn.

doing business, creating a general loss of confidence in the management of the debtor. Finally, the Lender Group submits that a Chapter 11 Trustee is needed to ensure that fraudulent conveyance actions will be pursued against insiders, including Mr. Lowery and other related entities.

In response, the debtor denies all of the allegations but concedes that the debtor has withdrawn large amounts of money from FiData - however, Mr. Lowery contends these funds were used to pay on the debt owed by the debtor to the Lender Group.

## III. <u>CONCLUSIONS OF LAW</u>

### A. <u>MOTION TO APPOINT CHAPTER 11 TRUSTEE</u>

Whether to appoint a Chapter 11 Trustee is controlled by 11 U.S.C. § 1104(a), which provides:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee–
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
> >
> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

14 - U.S. Bankruptcy Court, M.D. Tenn.

Section 1104(a) sets forth two alternative grounds for appointing a Chapter 11 Trustee, however, such an appointment is the exception rather than the rule and is an extraordinary remedy available to creditors. Thus, the burden of proof is on the movant to support such a motion with evidence that is clear and convincing. *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 670 (Bankr. W.D. Tenn. 1989) (citations omitted). "For evidence to be 'clear and convincing' it must 'produce[ ] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *In re Nat'l Staffing Serv., LLC*, 338 B.R. 31, 33 (Bankr. N.D. Ohio 2005) (citing *Cruzan by Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 285 n.11 (1990)). While the final decision to appoint a trustee rests in the sound discretion of the Court, there exists a strong presumption that the debtor should continue in possession. *In re H&S Transp. Co., Inc.*, 55 B.R. 786, 790 (Bankr. M.D. Tenn. 1982) (citations omitted).

## 1. 11 U.S.C. § 1104(a)(1) - Cause

If cause is found under this strict standard of proof, appointment of a Chapter 11 Trustee is mandatory. *See 11 U.S.C. § 1104(a)(1); In re Plaza De Retiro, Inc.,* 417 B.R. 632, 640 (Bankr. D.N.M. 2009) (citations omitted). Cause includes fraud, dishonesty,

15 - U.S. Bankruptcy Court, M.D. Tenn.

incompetence, gross mismanagement, or other similar actions. *In re Nartron Corp.*, 330

B.R. 573, 592 (Bankr. W.D. Mich. 2005). Factors that have been considered include:

> Materiality of misconduct; Evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors or customers; The existence of pre-petition voidable preferences or fraudulent transfers; Unwillingness or inability of management to pursue estate causes of action; Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; Self-dealing by management or waste or squandering of corporate assets.

*Id.* (citations omitted). A court may consider both the pre-and post-petition misconduct of

the current management when making a determination that "cause" exists for the

appointment of a Chapter 11 Trustee. *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 86

(Bankr. S.D.N.Y. 2007) (citation omitted).


The Court finds that clear and convincing evidence supports the appointment of a

Chapter 11 Trustee for cause.


## Pre-Petition Mismanagement

The proof regarding pre-petition transactions is disturbing. FiData is the only income

source for the debtor. While all transactions were recorded on the books of the debtor and

FiData, many of the transactions were not satisfactorily explained. A review of FiData's

financial statements showed that its revenue was transferred out to the debtor, Mr. Lowery,

and other related entities to the point where FiData could not pay critical vendors. When

Peoples State Bank and Farmers Bank became less profitable and stopped paying dividends

to Mr. Lowery, the insider and participation loans from FiData increased significantly. FiData became the source of funds for Mr. Lowery, his other entities, and his colleagues. Mr. Lowery continues to strip FiData through the debtor's proposed plan. The plan proposes to eliminate approximately $7,000,000 in intercompany receivables owed to FiData, and the plan does not provide for any capital infusion into FiData. The projections attached to the debtor's disclosure statement indicate that FiData will continue to make significant lease payments to ESC on equipment and software which FiData sold to and leases back from ESC. This agreement warrants further investigation, especially in light of the "no assignment" clause of the software license agreement between ESC and FiServe.[10]

The debtor's purchase of the Georgia house from Mrs. Lowery and the payment of accompanying expenses only to discover that the deed of trust had not been transferred is also troubling. All parties may have been under the mistaken belief that the deed had been transferred to the debtor. However, when the mistake was discovered, Mr. Lowery did not act in the best interest of the debtor. Instead of transferring the deed to the debtor, Mr. Lowery transferred the property to Tennessee Bank & Trust to pay down a debt owed by his family trust and guaranteed by Mr. and Mrs. Lowery. In return, Mrs. Lowery

---

[10]Section 1.5 of the software license agreement between ESC and FiServe provides: "Client rights under this agreement and in and to the Software may not be assigned, licensed, sublicensed, pledged, or otherwise transferred voluntarily, by operation of law or otherwise without Vendor's prior written consent, and any such prohibited assignment shall be null and void."

17 - U.S. Bankruptcy Court, M.D. Tenn.

executed two promissory notes totaling over $1,800,000 to the debtor. Thus, the debtor went from owning real and personal property to having two unsecured notes.

## Amendment of Schedules and Statements

The debtor filed its bankruptcy petition, which Mr. Lowery signed as Chairman, on November 28, 2011. The Schedules and Statements were not filed with the bankruptcy petition, and the debtor required additional time to prepare and file them. The original Schedules and Statements were filed on December 23, 2011. Even then, several amendments were later required, including some that were not filed until January 26, 2012.

Complicated cases normally involve amendments to the Schedules and Statements, but in this case, the majority of those amendments were to correct mistakes regarding Mr. Lowery's liabilities or the liabilities of other related entities and insiders. Moreover, the amendments regarding Mr. Lowery's liabilities and the liabilities of insiders were slow in coming despite questions raised by the U.S. Trustee at the meeting of creditors and at Mr. Lowery's deposition. As examples, Mr. Lowery did not initially list any insider distributions made by the debtor, nor did he disclose that he and his wife were guarantors on the debtor's loans from the Lender Group. Moreover, between the time the original Schedule B was filed on December 23, 2011, until the last amended Schedule B was filed on January 26, 2012, the debtor's notes receivable from Mr. Lowery went from $14,736,554.74 to $28,995,731.88. These errors are significant and show either an inability

18 - U.S. Bankruptcy Court, M.D. Tenn.

to understand what is required in a bankruptcy case, as Mr. Lowery testified, or an attempt to avoid transparency. Mr. Lowery is apparently a sophisticated businessman, and he has very competent counsel. Accordingly, it seems more likely that the errors resulted from Mr. Lowery's own efforts to downplay or camouflage his personal liabilities to the debtor.

## Conflict of Interests

An independent person must review many of the transactions involving the debtor, Mr. Lowery, and FiData. Mr. Lowery simply has too much at stake to act in the best interest of the debtor. Mr. Lowery has now disclosed that he owes the debtor almost $29,000,000. There are other various insiders and related entities that owe significant amounts to the debtor as well as many unexplained transfers out of the debtor and FiData. Moreover, Mr. Lowery testified that he should be able to reduce his personal debt by the transfer of his stock in Peoples State Bank and Farmers Bank to TCB that was part of the DPC agreement.[11] An independent analysis of many issues is required.

The Court also finds that the Lender Group's involvement with FiData supports the need for a Chapter 11 Trustee. Although Legends has not exercised its purported rights to vote FiData's stock since the debtor filed for bankruptcy protection, Ms. Ramsey, who is admittedly in a difficult situation, has turned to Legends in an attempt to save FiData.

---

[11]Note that the debtor borrowed money from TCB and then loaned it to Mr. Lowery so that he could purchase the stock in Peoples State Bank and Farmers Bank.

19 - U.S. Bankruptcy Court, M.D. Tenn.

Legends may not have instructed Ms. Ramsey on what actions to take, but Legends certainly has been influential on those decisions. A Chapter 11 Trustee would eliminate any potential overbearing by the Lender Group.

Based on the instances discussed above, the Court finds that the appointment of a Chapter 11 Trustee is mandated.

## 2. <u>11 U.S.C. § 1104(a)(2) - Best Interests Test</u>

The Court also finds that a Chapter 11 Trustee is in the best interest of all. Under 11 U.S.C. § 1104(a)(2), the Court must make a determination based on what is in the best interest of creditors, equity holders, and other interests of the estate. ***See In re Microwave Prods. of Am., Inc.***, 102 B.R. 666, 676. Whether a debtor-in-possession has the ability to fulfill its duties of care to protect the assets, loyalty, and impartiality are important to the analysis. ***In re Celeritas Tech., LLC***, 446 B.R. 514, 520 (Bankr. D. Kan. 2011) (citations omitted). Other factors to consider may include "(i) the overall management of debtor, both past and present, (ii) the trustworthiness of debtor's management, (iii) the confidence or lack thereof of the business community and of creditors in present management, and (iv) practical considerations, such as the benefits derived by the appoint[ment] of a trustee, balanced against costs." ***Id.*** at 520-21. The appointment of a Chapter 11 Trustee should be in the

interests of all those with a stake in the estate.  *See In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001).

Based on the proof, the Court finds that the success of FiData is key to the debtor's reorganization.  The proof showed that under Mr. Lowery's leadership, FiData's revenues were being siphoned to him personally or into other related entities to the point that FiData could no longer pay its critical vendors in a timely manner.  These significant transfers from FiData validate the banking community's concern regarding Mr. Lowery's ability to maximize the value of FiData, the debtor's only income producing asset.  Mr. Bates' testimony reflected the lack of confidence in the recovery of FiData or of the reorganization of the debtor under the leadership of Mr. Lowery.  The intercompany transfers also jeopardized the continued services of FiData's critical vendors.  It was only when these transfers were stopped that critical venders were finally paid and continue to be current.

Accordingly, the Court finds that the appointment of a Chapter 11 Trustee is both mandated and in the best interest of all with a stake in the estate.

## B.  <u>VOTING RIGHTS OF FIDATA SHARES</u>

The debtor filed an expedited motion for contempt and sanctions for violation of the automatic stay and an expedited motion for a preliminary injunction.  The debtor has amended its requests to the entry of an order determining the respective rights of the debtor

and the Lender Group to vote the FiData stock or otherwise control FiData. The parties agreed that neither would exercise any of the voting rights of the debtor's stock in FiData absent further order of this Court.

Based on the decision to appoint a Chapter 11 Trustee, the Court finds that the appointed Chapter 11 Trustee should have an opportunity to present a position to the Court after reviewing the pleadings, testimony, and exhibits. The Chapter 11 Trustee should have a say in who controls the debtor's stock in its most significant asset. Accordingly, this issue is reserved until such time as a Chapter 11 Trustee is appointed and has had an opportunity to weigh in.

## IV. CONCLUSION

Accordingly, the Court finds that the motion to appoint a Chapter 11 Trustee should be granted and that the remaining issues should be reserved.

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**